In re APEX OIL COMPANY, et al., Debtors.

Bankruptcy No. 87–03804–BKC–BSS.

United States Bankruptcy Court, E.D. Missouri, E.D.

Jan. 26, 1990.

Gregory D. Willard and Laurence M. Frazen, St. Louis, Mo., for Ernst & Young Bryan, Cave, McPheeters & McRoberts.

Lloyd A. Palans, Examiner, Michael A. Kahn, Gallop, Johnson & Neuman, Clayton, Mo.

Robert Jay Moore, St. Louis, Mo., for debtors, Gendel, Raskoff, Shapiro & Quittner.

Dennis A. Ferrazzano, Barack, Ferrazzano & Kirschbaum, Chicago, Ill., for debtors.

James S. Cole, Asst. U.S. trustee, U.S. Dept. of Justice, St. Louis, Mo.

Allen S. Boston, James V. O'Brien, and James L. Matchefts, Lewis, Rice & Fingersh, St. Louis, Mo., for Mr. Novelly.

Steven N. Cousins, Armstrong, Teasdale, Kramer, Vaughn & Schlafly, St. Louis, Mo., for Unsecured Creditors Committee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARRY S. SCHERMER, Bankruptcy Judge.

### Introduction

This matter came before the Court for hearing on January 25, 1990 pursuant to the Application for Final Allowance of Compensation and Reimbursement of Expenses by Ernst & Young (successor by merger to Ernst & Whinney, hereinafter referred to as "E & Y"), Special Financial Advisor to the Examiner (the "Application"), Gregory D. Willard, Laurence M. Frazen, Bryan, Cave, McPheeters & McRoberts having appeared on behalf of E & Y, and various other parties being represented as shown below.

The Court reviewed and carefully considered the Application and all supporting memoranda and affidavits thereto and all evidence presented in support of and in opposition to said Application.

All creditors and parties in interest received due and sufficient notice and had an opportunity to be heard as to the Application.

The following entries constitute the Court's Findings of Fact and Conclusions of Law with respect to the Court's ruling on the Application pursuant to Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT

1. On December 24, 1987, each of the Debtors filed with this Court a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession.

2. On October 11, 1988, Novelly Oil Company and Goldstein Oil Company, the partners of Apex Oil Company, filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code and have been procedurally consolidated with the other debtors herein. (All debtors are sometimes collectively referred to herein as "Debtors" or "Apex".)

3. On January 27, 1988, acting on application of the Official Unsecured Creditors' Committee (the "Creditors' Committee"), this Court entered its Order Appointing Examiner.

4. The accounting firm of E & Y, through its partner Mr. Harold W. Sullivan, Jr., was employed by the Examiner, pursuant to two separate Orders of this Court dated January 11, 1989 and February 17, 1989, respectively, for the purpose of assisting the Examiner in the performance of certain Court appointed duties.

5. E & Y was initially retained by the Examiner to provide limited and special purpose consulting regarding issues raised during discovery in connection with Debtors' Substantive Consolidation Motion and issues relative to the proposed settlement

with the Debtors' principals. On February 17, 1989, the Court entered an Order expanding the scope of E & Y's involvement to assist the Examiner in the preparation of the Examiner's Statement of Investigation of Causes of Action Available to the Estate (the "Examiner's Report" or the "Report") which was filed with the Court on June 19, 1989.

6. E & Y has filed with the Court an application for final allowance of compensation for professional services rendered and reimbursement of actual and necessary costs and expenses incurred in the performance of professional services for the Examiner. All such services were performed at the request of the Examiner.

7. A summary of the fees and out-of-pocket expenses incurred by E & Y in the course of providing the professional services to the Examiner is as follows:

|  | Hours | Fees | Total |
|---|---|---|---|
| January, 1989 | 39.9 | $ 8,764 | |
| February, 1989 | 46.3 | 11,613 | |
| March, 1989 | 164.7 | 34,021 | |
| April, 1989 | 362.3 | 54,231 | |
| | 613.2 | 108,629 | |
| Out-of-pocket expenses | | 2,881 | |
| **TOTAL FIRST INTERIM APPLICATION** | | | $111,510 |
| May, 1989 | 479.7 | $ 74,536 | |
| June, 1989 | 227.1 | 42,148 | |
| July, 1989 | 43.8 | 9,195 | |
| August, 1989 | 29.8 | 6,971 | |
| | 780.4 | 132,850 | |
| Out-of-pocket expenses | | 1,440 | |
| **TOTAL SECOND INTERIM APPLICATION** | | | $134,290 |
| September, 1989 | 1.6 | $ 440 | |
| October, 1989 | — | — | |
| November, 1989 | 6.1 | 1,678 | |
| December, 1989 | 13.4 | 3,685 | |
| | 21.1 | 5,803 | |
| Out-of-pocket expenses | | 395 | |
| **TOTAL FOR WHICH AN INTERIM APPLICATION HAS NOT YET BEEN MADE** | | | $ 6,198 |
| **TOTAL OF FEES AND EXPENSES INVOICED BY E & Y** | | | $251,998 |

8. E & Y has maintained detailed time records in connection with all of the professional services described herein. All time records were made concurrently with or shortly after the rendering of professional services.

9. From January 11, 1989, to December 31, 1989, E & Y professionals devoted an aggregate of 1,414.7 hours at an average hourly rate of $174.80.

10. In addition to the time reflected in E & Y's Application, E & Y has incurred time as a result of related matters on which it has been legally compelled to respond, but which have *not* been billed to Debtors.

11. E & Y did not receive a retainer in conjunction with its engagement by the Examiner.

12. E & Y has not previously applied to this Court for allowance of its compensation for services rendered and reimbursement of costs and expenses incurred during the period September 1, 1989 to December

31, 1989. The cost of services rendered and reimbursement of costs and expenses incurred by E & Y during the period September 1, 1989 to December 31, 1989 amounted to $6,198.00. In accordance with the Court Order dated January 27, 1988, regarding fees and expenses, E & Y has been paid $330.00, and the remaining $5,868.00 remains unpaid.

13. No agreement or understanding exists between E & Y and any other person other than the members, associates and employees of E & Y for the sharing of compensation received or to be received for services rendered in this case.

14. There has not been any duplication of time and/or effort between the services performed by E & Y and those services performed by the various accountants, financial advisors and consultants employed by other parties-in-interest in this case. E & Y's services were confined to assisting the Examiner with his investigation of causes of action available to the Debtors' estates and his evaluation of documentation made available by the Debtors and certain non-debtor affiliates and the response of the Debtors' principals and certain non-debtor affiliates to the Report.

15. E & Y has not entered into any agreement, express or implied with any party-in-interest, including the Examiner, the Debtors, any creditor, or any representative of any of them, or with any attorney for such party-in-interest, for the purpose of fixing the fees or other compensation to be paid to any party-in-interest, for services rendered in connection herewith, from the assets of the Debtors.

16. Various accountants, tax professionals and consultants of E & Y have performed necessary and essential services on behalf and at the request of the Examiner. The significant demands of the case have been such that insolvency accounting, business investigations, and personal income, corporate, partnership and international tax expertise and other financial advisory services have been required of E & Y to assist the Examiner. The completion of the Examiner's Report required that highly skilled professionals perform expeditious and accurate accounting, investigation, tax and financial advisory consulting services.

17. Mr. Sullivan and E & Y are recognized as among the most outstanding bankruptcy and insolvency accounting professionals in the United States. Mr. Sullivan's professional services in this matter are indicative of the appropriateness of that reputation.

18. In particular, there can be no doubt that Mr. Sullivan is at the top of his profession when it comes to the marriage of the disciplines of accounting and bankruptcy law; he has an uncanny ability to make difficult financial issues and analyses readily understandable for lawyers and judges.

19. Mr. Sullivan and E & Y provided guidance and insight in assisting the Examiner in his investigation. Numerous factors combined to make the investigation in these cases a substantial and difficult undertaking. First and foremost was the magnitude and complexity of (i) the Debtors' affairs, (ii) the transactions among the Debtors themselves and with their non-debtor affiliates, and (iii) their relationships with principals and third parties. The extent of the Debtors' activities with non-debtor affiliates increased the magnitude of the investigation as illustrated by the fact that one such non-debtor entity engaged in close to $1 billion in oil trading transactions with the Debtors during the 1980's. The investigation was further hindered by numerous attempts on the part of the Debtors' principals and non-debtor affiliates to delay the obtaining of information.

20. In order to meet the time frame set by the Court for the filing of the Examiner's Report, E & Y's work in support of the Examiner's investigation was performed within a very short period of time. This is demonstrated by the following summary of key dates:

| | |
|---|---|
| 1/12/89 | Initial meeting with the Examiner. |
| 2/17/89 | Scope of E & Y assistance expanded. |
| 2/20/89 | Visit to Arthur Andersen & Co. offices. |
| 3/2/89 | Copies of documents obtained from AA & Co. |
| 3/28/89 | Visit to Bermuda. |

| | |
|---|---|
| 4/89 | Documents from visit to Bermuda obtained. |
| 5/23/89 | Depositions commence. |
| 6/14/89 | Report issued. |

Only 118 days elapsed from the time E & Y began work until the time the work was completed. Only 78 days elapsed from the time of the initial visit to Bermuda until the completion of the Examiner's Report. Given the complexity of the financial transactions and issues involved, these time frames are highly unusual.

21. The projects performed for the Examiner by Mr. Sullivan and E & Y fall into five general categories:

(1) Assistance in the identification of appropriate financial information to be obtained through discovery.

(2) Participation in the development of the Examiner's investigation strategies.

(3) Identification of areas of inquiries to be made in depositions.

(4) Evaluation of information obtained by the Examiner during discovery.

(5) Drafting and submission of the Examiner's Report.

22. The Examiner's investigation and Report represent a one-of-a-kind undertaking. To the extent there was no road map to follow, the Examiner and E & Y were operating in uncharted waters. Mr. Sullivan's unique professional abilities, implemented through the E & Y organization, provided the professional capabilities that were essential to the timely completion of the Examiner's Report.

23. Specifically, the work of Mr. Sullivan and E & Y included the following:

—A detailed financial analysis of documents obtained as well as reconciliation of those documents to additional documents in E & Y files that were accumulated during the course of its prior engagement for the Secured Lender group.

—Visits to the offices of Arthur Andersen & Co., Apex Oil Company and Appleby, Spurling & Ken Services, Ltd. to review vast amounts of documents and financial data.

—Numerous consultations with legal counsel from Gallop, Johnson & Neuman regarding information requirements, investigation strategy, scope of inquiries and analysis of documents obtained.

—A detailed investigation and analysis of the Debtors' historical transactions with affiliates.

—Meetings and correspondence with representatives of the Debtors to efficiently facilitate the completion of the investigation.

—A detailed investigation of selected personal income and partnership tax issues.

—An analysis of stock transactions conducted by affiliates.

—The development of a chronology of events that occurred from July 1981 to the filing date.

—The investigation of combined futures activity.

—The development of investigation procedures requested by the Examiner.

—Attendance at certain depositions.

—Assistance of Gallop, Johnson & Neuman in drafting selected financial sections of the Report as well as review of the facts presented to verify accuracy and consistency.

—Assistance of the Examiner in responding to inquiries regarding and published responses to the Report.

24. The Examiner's Report was more than just a legal outline of potential causes of action. The Report was a fact-intensive financial study integrated into a comprehensive legal analysis. Relevant financial facts and data are presented throughout the Examiner's Report in support of the legal analysis. The Examiner's Report relies heavily upon Mr. Sullivan's financial analysis with respect to the following:

—The description of the rise and fall of the Debtors' business empire and a chronology of the business erosion and collapse.

—The financial significance of AIC, Ltd.

—The description of Apex Oil Company's financial support of AIC, Ltd.

—The calculation of reimbursement obligations allegedly owed to the Debtors.

—The detailed analysis of Intercompany Transactions.

—The analysis of the financial performance of off-shore Apex.

—The compilation of the dividends allegedly paid to Debtors' principals Messrs. Novelly and Goldstein.

—The "Barge Partnership" transactions.

25. An illustrative, although not exhaustive, list of the unique and complex financial transactions and issues encountered and analyzed in the investigation included:

—Tax allocation in tax-driven transactions.

—Partnership, corporate, Subchapter S, and less than 100% ownership issues.

—Offshore dealings with affiliates including Europe, the Carribean and the Pacific Basin.

—A myriad of alleged affiliate dealings ranging from management control, transfer of assets and direct dealings to indirect dealings and shareholder and management issues.

—Transfer pricing of direct and indirect dealings with affiliates.

—Financial impact of direct and indirect guarantees.

26. Through Mr. Sullivan and E & Y's representation of the Debtors' Lender Group for the four years preceding bankruptcy, E & Y was able to give the Examiner the benefit of E & Y's substantial knowledge about the Debtors and their non-debtor affiliates. Although the focus of the Examiner's investigation was entirely different than that of the Lender Group, at the time of his retention Mr. Sullivan was "up to speed" on the Debtors' general financial affairs, corporate structure and the format of their accounting records. He was, therefore, able to perform work for the Examiner in an expeditious and efficient manner. Much of the information gathered by E & Y in connection with its prior work had been computerized and was thus easily accessed when needed by the Examiner.

27. With a very restricted flow of information to work from, E & Y was able to quickly identify documentation that enabled the Examiner to continue and complete the Examiner's Report. Throughout the investigation, Mr. Sullivan consistently reacted to analyze newly discovered financial information and incorporated such information into the Examiner's findings. For example, after the Examiner's investigation was complete, the Debtors identified approximately 1,800 additional and relevant documents that previously had not been made available to the Examiner or E & Y.

28. The Examiner's Report enabled the negotiation of a consensual plan of reorganization which contained an additional proposed dividend to creditors in an amount of approximately $13.0 million in excess of that previously offered.

29. While the Court declines to award any additional "bonus" amount to E & Y for its outstanding services (Mr. Sullivan and E & Y having performed in a manner consistent with their above-described reputation, which itself was the basis for their retention by the Examiner and appointment by the Court), the Court specifically finds that E & Y's requests for fees of $247,282 and disbursements of $4,716 are reasonable, and those items are hereby allowed in full.

## II. CONCLUSIONS OF LAW

1. In determining the amount of professional fees to be allowed in this case, Section 330(a) of the Bankruptcy Code is controlling. Section 330(a) provides, in relevant part:

[T]he court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) *reasonable compensation* for actual, necessary services rendered ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

968

11 U.S.C. § 330(a) (emphasis added). "Reasonable compensation" is usually determined by multiplying a reasonable hourly rate by the number of hours actually and reasonably expended. This figure is to be regarded as presumptively reasonable under Section 330(a) and has been referred to as the "lodestar amount."

2. The Court is vested with broad discretion in determining the amount of fees to be awarded as compensation for services performed in connection with bankruptcy proceedings.

3. The fees charged by E & Y are appropriate given the high level of expertise and competency of Mr. Sullivan and the E & Y professionals engaged in this matter.

4. Based upon the foregoing Findings of Fact and the factors which govern the reasonableness of fees as enumerated above, this Court concludes that E & Y is entitled to allowance and payment of the entire amount of its requested fees and expenses of $247,282, $4,716, respectively.

5. An Order consistent herewith has been entered by the Court.